IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JACOB GONZALES,

      Plaintiff,

    v.                                       2:15-cv-00152-MV-LF

GREGG MARCANTEL,[1] JERRY ROARK,
JEFFREY WRIGLEY, JOHN BEAIRD,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER comes before the Court on defendants former Secretary of the New

Mexico Corrections Department ("NMCD") Gregg Marcantel, and former NMCD Director of

Adult Prisons Jerry Roark's,[2] *Martinez*[3] report, including their motion for summary judgment

(Doc. 36), filed on June 2, 2017. Plaintiff Jacob Gonzalez filed a variety of documents in

response to the *Martinez* report, including a letter on July 6, 2017 (Doc 39), which the Court

construed as a motion for an extension of time (Doc. 42), a letter on July 12, 2017 (Doc. 41), a

letter on July 25, 2017 (Doc. 43), a motion on August 3, 2017 (Doc. 44), and a letter on August

17, 2017 (Doc. 45). The Court construes these documents collectively as Gonzales' response to

---

[1] Defendant Gregg Marcantel's name is spelled incorrectly—"Mercantel"—on the face of the complaint. In addition, David Jablonski, the current NMCD Cabinet Secretary, is substituted for Mr. Marcantel to the extent Gonzales seeks prospective injunctive relief in the form of a change in NMCD policy. *See* Doc. 36 at 1 n.1; Doc. 38.

[2] Roark was promoted to Deputy Cabinet Secretary of NMCD effective May 6, 2017. German Franco is currently the Director of Adult Prisons. Mr. Franco has not been substituted for Roark, however, because plaintiff's allegations and claims relate to policies in effect prior to May 6, 2017. *See* Doc. 31 at 1 n.2.

[3] *Martinez v. Aaron*, 570 F.2d 317, 319–20 (10th Cir. 1978).

the *Martinez* report.[4]  Gonzales also filed a letter on November 30, 2017.  Doc. 47.  Although

Gonzales does not style his letter as a motion or ask the Court for leave to amend his complaint,

along with advising the Court of his address change, Gonzales makes new allegations with

respect to the facility in which he currently is being housed.  *Id*.  The Court will construe this

letter as a motion to amend.

The Honorable Martha Vazquez referred this case to me to conduct hearings, if

warranted, including evidentiary hearings, and to perform any legal analysis required to

recommend to the Court an ultimate disposition of the case.  Doc. 11.  Having reviewed the

submissions of the parties, and being fully advised, I find that there are no genuine issues of

material fact, and that defendants are entitled to judgment as a matter of law because Gonzales

fails to establish that defendants violated his constitutional rights.  I therefore recommend that

the Court deny Gonzales' motion to amend, and dismiss his complaint with prejudice.

## I.      Background and Procedural Posture

Gonzales in an inmate housed by the NMCD.  When he initiated this lawsuit, Gonzales

was housed at the Lea County Correctional Facility in Hobbs, New Mexico ("LCCF").  *See* Doc.

1 at 1.  During the pendency of this lawsuit, Gonzales was moved from LCCF to the Guadalupe

County Correctional Facility in Santa Rosa, New Mexico ("GCCF").  *See* Doc. 35 at 7.  He

currently is housed at Northeast New Mexico Detention Facility in Clayton, New Mexico

("NENMDF").  *See* Doc. 47; Doc. 48 at 3.

---

[4] In the Court's order granting Gonzales an extension of time, the Court gave Gonzales an
additional 30 days—or until August 14, 2017—to file his response to the *Martinez* report.  Doc.
42 at 1.  The Federal Rules of Civil Procedure allow three days for mailing.  FED. R. CIV. P. 6(d).
Accordingly, Gonzales' August 17, 2017 letter filed in response to the *Martinez* report is timely.

Gonzales commenced this civil rights lawsuit pursuant to 28 U.S. C. § 1343[5] and 42 U.S.C. § 1983 against NMCD, Secretary of Corrections Gregg Marcantel, Director of Adult Prisons Jerry Roark, Governor Susana Martinez, former LCCF Warden Jeff Wrigley, and Security Warden John Beaird.[6] Doc. 1 at 1. Gonzales alleges that defendants perpetuated policies that violated his First Amendment right to freedom of expression and freedom of speech by not allowing him to order unedited music, to receive pictures of his girlfriend or wife in lingerie, or to order magazines like "Curves," "Show" or "Maxim." *Id*. at 2. Gonzales also alleges that NMCD used policies "to manipulate and burn us on our visits by using the vague and contradictory policy to suspend our visits without proof of guilt." *Id*. at 3. Gonzales seeks injunctive and declaratory relief as well as monetary compensation for the alleged violations of his constitutional rights. *Id*. at 4–5.

In a previous memorandum opinion and order, Judge Vazquez dismissed Gonzales' claims against the New Mexico Department of Corrections, Susana Martinez, and his Fourteenth Amendment equal protection claim. Doc. 12. She further construed his Fifth Amendment due process and Fourteenth Amendment due process claims as one in the same, and dismissed any claims Gonzales purported to bring on behalf of other inmates. *Id*. Defendants Marcantel and

---

[5] 28 U.S.C. § 1343 states:

> (a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
> * * * *
> (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States . . . .

[6] In his complaint, Gonzales identifies John Beaird as "Deputy Warden." Doc. 1 at 1–2. However, in his motion to dismiss, Beaird identified himself as "Security Warden." Doc. 16 at 1.

Roark answered the complaint. Doc. 17. Defendants Beaird and Wrigley each filed a motion to dismiss Gonzales' claims against them (Docs. 16, 23) and, adopting the magistrate judge's recommendation, the Court granted their motions and gave Gonzales 21 days to seek leave to amend his complaint as to his claims against Beaird and Wrigley. Doc. 29 at 3. Gonzales sought an extension of time to seek leave to amend (Doc. 30), which the Court granted (Doc. 31). Gonzales did not move to amend his complaint within the time allowed by the Court. Consequently, the Court dismissed Gonzales' claims against Defendants Beaird and Wrigley. Doc. 33.

The Court ordered defendants Marcantel and Roark to submit a *Martinez* report. Doc. 34. Specifically, the Court ordered defendants to address Gonzales' allegations that the New Mexico Department of Corrections ("NMCD")

> . . . perpetuated a policy that violated his First Amendment right to freedom of expression and freedom of speech by not allowing him to order unedited music, to receive pictures of his girlfriend or wife in lingerie, or to order magazines like "Curves," "Show" or "Maxim." Doc. 1 at 2. Gonzales also alleges that defendants' policies are vague with respect to time limits and are used to manipulate and burn [him] on [his] visits by using the vague and contradictory policy to suspend [his] visits without proof of guilt," in violation of his right to due process.

*Id.* at 1. Defendants' filed their *Martinez* report on June 2, 2017. Doc. 36. In the *Martinez* report, defendants argue that they are entitled to summary judgment. *Id.* Gonzales responded with several letters to the Court, as described above.

## II.     Defendants' Motion for Summary Judgment

### A. *Standard for Summary Judgement*

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment has the initial burden of establishing, through admissible

evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the party opposing summary judgment must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Although all facts are construed in favor of the nonmoving party, it still is the nonmoving party's responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (internal quotation marks omitted).

For purposes of summary judgment, a prisoner's complaint is treated as an affidavit if it alleges facts based on the prisoner's personal knowledge and has been sworn under penalty of perjury. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). A *Martinez* report also is treated as an affidavit. *Id.* A court cannot resolve material disputed factual issues by accepting a *Martinez* report's factual findings when they are in conflict with pleadings or affidavits. *Id.* at 1109. Conclusory allegations, however, without specific supporting facts, have no probative value and cannot create a genuine issue of fact. *See Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992). As is true with all affidavits, statements of mere belief must be disregarded. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006).

The Court liberally construes Gonzales' filings because he is appearing pro se. *Hall*, 935 F.2d at 1110. Nevertheless, as the non-moving party, Gonzales still must "identify specific facts

that show the existence of a genuine issue of material fact." *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (internal quotation marks omitted). Conclusory allegations are insufficient to establish an issue of fact that would defeat the motion. *Harrison v. Wahatoyas, L.L.C.*, 253 F.3d 552, 557 (10th Cir. 2001).

In a suit brought by a pro se prisoner, a court may order the defendants to investigate the plaintiff's claims and submit a report of that investigation, called a *Martinez* Report. *See Hall,* 935 F.2d at 1109; *Martinez v. Aaron*, 570 F.2d 317, 319–20 (10th Cir. 1978). A court may use the *Martinez* Report to grant summary judgment upon motion of the defendants. *Hall*, 935 F.2d at 1009–13; *see also Celotex*, 477 U.S. at 326 (courts possess the authority to enter summary judgment sua sponte, so long as the losing party is on notice that she must come forward with all of her evidence).

B. *Standard for Evaluating the Constitutionality of Prison Regulations*

Prisoners are entitled to the protections of the Constitution. *Turner v. Safley*, 482 U.S. 78, 84 (1987). Among these protections is the First Amendment right of a prisoner to correspond with others outside the prison. *See id.* (evaluating prison regulation restricting correspondence between inmates at different prison facilities); *Gee v. Pacheco*, 627 F.3d 1178, 1187 (10th Cir. 2010) (considering prisoner's claims under the First Amendment, "in particular his right to communicate with persons outside the prison"). Inmates have a right "to receive information while in prison." *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004). These rights, however, may be cabined by corrections policies implemented in the interests of safety and security. *Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989). Indeed, "[p]risoners' rights may be restricted in ways that 'would raise grave First Amendment concerns outside the prison context.'" *Gee*, 627 F.3d at 1187 (quoting *Thornburgh*, 490 U.S. at 407). In evaluating the

constitutionality of a prison regulation that "'impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner*, 482 U.S. at 89).

In *Turner*, the Supreme Court set out four factors courts should use to evaluate the reasonableness of a prison regulation that infringes on constitutionally protected rights. 482 U.S. at 89–90. First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). The regulation at issue must not be "arbitrary" or "irrational." *Id.* at 90. Second, courts must consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* Third, courts must weigh "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Where accommodating the asserted right will strain the prison's resources or have some other "significant 'ripple effect,'" courts should be particularly deferential to the discretion of prison officials. *Id.* Finally, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* (citing *Block*, 468 U.S. at 587). However, prison regulations need not satisfy the stringent "least restrictive alternative" test, and courts need not consider "every conceivable alternative method"; rather, the court should consider whether "obvious, easy alternatives" exist that would accommodate the right "at *de minimis* cost to valid penological interests." *Id.* at 90–91 (internal quotation marks omitted).

A *Turner* analysis "requires close examination of the facts." *Boles v. Neet*, 486 F.3d 1177, 1181 (10th Cir. 2007). Courts must consider the facts "on a case-by-case basis" to determine whether a prison regulation's impingement on an inmate's First Amendment rights is

justified. *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002). While defendants must set forth a legitimate penological interest reasonably related to the regulation at issue, the plaintiff prisoner bears the ultimate burden of disproving the validity of the regulations. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). The burden rests on the plaintiff "to set forth 'specific facts' that, in light of the deference that courts must show to the prison officials, could warrant a determination" in the prisoner's favor. *Beard v. Banks*, 548 U.S. 521, 525 (2006) (quoting FED. R. CIV. P. 56(e); *Overton*, 539 U.S. at 132).

Courts must be mindful of the "institutional objectives" served by the regulations at issue and the "measure of judicial deference owed" to prison officials in their implementation of such objectives. *Pell v. Procunier*, 417 U.S. 817, 827 (1974); *see also Beard*, 548 U.S. at 528 ("[C]ourts owe 'substantial deference to the professional judgment of prison administrators.'" (quoting *Overton*, 539 U.S. at 132)). The *Turner* standard "is necessary if 'prison administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Turner*, 482 U.S. at 89 (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977)). On summary judgment, the plaintiff must do more than just "disagree with the views expressed" by prison officials in affidavits; rather, the prisoner "must point to evidence creating genuine factual disputes that undermine those views." *Wardell v. Duncan*, 470 F.3d 954, 960 (10th Cir. 2006). Courts "must distinguish between evidence of disputed facts and disputed matters of professional judgment," the latter of which requires judicial deference. *Beard*, 548 U.S. at 530.

C. *Exhaustion of Prison Grievance Procedures*

The Prison Litigation Reform Act (PLRA) states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The purpose of the grievance procedure is to permit prison administrators to investigate and address the issue. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006).

The "failure to exhaust is an affirmative defense under the PLRA." *Jones v. Bock*, 549 U.S. 199, 216 (2007). Here, Gonzales is seeking injunctive relief as well as compensatory and punitive damages. Doc. 1. "[T]he PLRA requires a prisoner seeking only money damages through a lawsuit brought under federal law to 'complete a prison administrative process that could provide some sort of relief on the complaint stated, but no money,' before filing suit." *Sanders v. Williams*, 2010 WL 1631767, *9 (D.N.M. Mar. 20, 2010) (citing and quoting *Booth v. Churner,* 532 U.S. 731, 734 (2001)). Where administrative remedies are available with respect to a prisoner's claim for injunctive relief, a claim may be properly dismissed pursuant to § 1997e for failure to exhaust administrative remedies. *Florence v. Booker*, 161 F.3d 17 (Table), 1998 WL 694521, *1 (10th Cir. 1998) (unpublished). Section 1997e(a) "requires full exhaustion of the available formal grievance procedure, regardless of the nature of the relief being sought." *Boulden v. Tafoya*, 37 F. App'x 974, 975 (10th Cir. 2002) (citing *Booth v. Churner*, 532 U.S. 731, 741 (2001)); 42 U.S.C. § 1997e(a).

"What constitutes proper exhaustion is governed by the requirements of the applicable prison grievance system . . . ." *Lane v. Rozum*, 2016 WL 1212782, *3 (W.D. Pa. Mar. 11, 2016) (unpublished) (citing *Woodford*, 548 U.S. at 95); *Saleh v. Wiley*, 2012 WL 4356219, *4 (D. Colo. Sept. 24, 2012) (unpublished) (informal statements to prison administrators are not part of grievance procedure and cannot constitute a basis for exhaustion). Once a plaintiff has exhausted a grievance procedure, the next proper question is, "What claims against what defendants does this grievance exhaust?" *Lane*, 2016 WL 1212782, at *4.

According to Gonzales's grievance history, he has exhausted the grievance procedure with respect to some, but not all of the claims in his lawsuit. For example, on March 7, 2012, Gonzales complained that he was unable to obtain mail that included a perfumed item, a picture of his incarcerated brother,[7] and a picture of his wife or girlfriend partially or totally nude and posed in a sexually explicit position. Doc. 36-2 at 31–42. Gonzales exhausted this grievance. *Id.*; Doc. 36 at 19–20. On July 5, 2012, Gonzales complained about not being allowed to order magazines such as "Maxim" and "Show," and not being able to receive pictures of his brother or sexy pictures of his girlfriend. Doc. 36-2 at 56–62. Gonzales exhausted this grievance. *Id.*; Doc. 36 at 20. On the other hand, Gonzales did not exhaust any grievance regarding unedited music.[8] Doc. 36 at 25.

D. *Undisputed Material Facts*

1. NMCD policy allows inmates to receive correspondence and access to publications. Doc. 36-1 at 55, 72, 89, 107 (correspondence); *id.* at 56, 61, 78, 90, 95, 107, 113, 125, 131,

---

[7] Gonzales does not allege a violation of his rights based on not being able to receive a picture of his incarcerated brother.

[8] On March 11, 2013, Gonzales complained that he could not download music while he was in disciplinary segregation. Doc. 36-2 at 63–68. While this grievance was exhausted, it was not based on unedited music. However, it was the only music-related grievance in Gonzales' documented grievance history. Doc. 36 at 21–22.

147 (publications).

2. Access to correspondence and publications is limited if the correspondence or publication threatens the safety and security of the facility and other persons. *Id.* at 55, 72, 89, 107.

3. Inmate mail, both incoming and outgoing, is opened and inspected. *Id.* at 56, 58, 90, 92, 127, 144.

4. Mail may be accepted or rejected "based on the legitimate institutional interests of order and security." *Id.* at 56, 73, 90, 107, 125.

5. One of the ways NMCD maintains its institutional interests of order and security is to "avoid creating a sexualized atmosphere in the prisons." Doc. 36-4 at 3.

6. A prisoner's display of sexually explicit photographs could cause a hostile work environment. Doc. 36-4 at 3.

7. A sexually-charged environment is detrimental to sex offenders' treatment and rehabilitation. Doc. 36-4 at 3.

8. The Prison Rape Elimination Act (PREA) requires NMCD to maintain a policy of zero tolerance of sexual abuse and sexual harassment. *Id.*; 28 C.F.R. § 115.11(a).

9. "Prohibiting inmates from displaying/posting [sexually explicit] photographs from publications would not be an effective solution because of the administrative problems of monitoring the cells and of needing the inmates' cooperation in not displaying/posting the photographs." Doc. 36-4 at 3.

10. Monitoring each inmates' cell to remove a posted photograph would add to the burden of already strained staff resources. *Id.* For example, one correctional officer can monitor for posted material, but it would take additional correctional officers to enter the cell of a noncompliant inmate. *Id.*

11. Attempting to monitor publications and remove pages with sexually explicit photographs would require additional mailroom staff, which is administratively infeasible, and could cause more discontent then prohibiting the publications outright.  Doc. 36-4 at 3–4.

12. "Disciplining inmates for displaying photographs creates additional administrative burdens for prison administration."  *Id.* at 3.

13. NMCD has promulgated policies with regard to photographs and publications to keep photographic images of sexually explicit content out of the hands of inmates housed in NMCD facilities.  Doc. 36-1 at 59, 60, 76–77, 93, 94, 111, 129, 145.

14. Specifically, NMCD does not allow material that is "obscene" or that includes "photographic images of sexually explicit content . . . .  This includes but is not limited to sexually explicit depictions of partially or total human nudity.  Publications that regularly and consistently contain such content may be rejected on this basis."  Doc. 36-1 at 59, 60, 76, 77 (publications may be rejected if they contain "photographs of female(s) partially or totally nude and/or posed in a sexually explicit position"), 93, 111, 129,145 (defining material that is obscene).

15. Photographs are rejected pursuant to the same standards and procedures as publications.  Doc. 36-1 at 94, 112, 129, 146.

16. "Inmates . . . incarcerated at NMCD facilities are permitted to purchase personal electronic devices, such as MP3 players, and are also permitted to purchase music downloadable onto their personal devices.  The purchases are made from funds deposited in the inmates' own accounts, through a service provider (Access Corrections, Inc.) that is contracted by NMCD to provide these services to the inmates."  Doc. 36-3 at 2.

17. Some music contains violent or sexually explicit lyrics that are inappropriate for inmates. As part of the service that Access Corrections, Inc. provides to NMCD, it edits the music it makes available to inmates to delete content that is inappropriate for inmates. The editing makes that music available to the inmates, minus the inappropriate content. *Id*.

18. On March 7, 2012,[9] Gonzales submitted a grievance complaining that, among other things, a picture of his wife or girlfriend partially or totally nude and/or posed in a sexually explicit position was rejected from being delivered to him. Doc. 36 at 19–20; Doc. 36-2 at 32–47. Gonzales exhausted this grievance. *Id*.

19. On July 5, 2012,[10] Gonzales submitted a grievance complaining about not being allowed to order magazines such as "[Maxim]"[11] and "Show," and not being allowed to receive "sexy pictures" of his girlfriend. Doc. 36 at 20; Doc. 36-2 at 56–61. Gonzales exhausted this grievance. *Id*.

20. Gonzales did not exhaust a grievance regarding unedited music. Doc. 36 at 25.

E. *Discussion*

1. Photographs and Publications

Gonzales claims that NMCD's policy prohibiting him from receiving sexually explicit photographs of his girlfriend and publications such as Maxim, Curves, or Show, violate his First

---

[9] Gonzales submitted his grievance on March 7, 2012. Doc. 36 at 20. Gonzales initiated an informal complaint on February 22, 2012. Doc. 36-2 at 42. The grievance was submitted to a grievance officer on March 7, 2012. *Id.* at 41.

[10] Gonzales submitted his grievance on July 5, 2012. Doc. 36 at 20. Gonzales initiated an informal complaint on June 26, 2012. Doc. 36-2 at 62. The grievance was submitted to a grievance officer on July 5, 2012. *Id*. at 61.

[11] In Gonzales' complaint, he identifies the prohibited magazines as "Maxim," "Curves," and "Show." Doc. 1 at 2. Throughout the briefing, "Maxim" also is referred to as "Maxium" and "Maximum." Where the parties refer to "Maxium" and "Maximum," the Court presumes that the parties intend to refer to "Maxim."

Amendment rights. Defendants concede that Gonzales has sufficiently exhausted this claim. Applying the *Turner* test, NMCD's policies prohibiting inmates from receiving sexually explicit material is not a violation of Gonzales' constitutional rights.

First, there is a rational connection between the prison regulation and a legitimate governmental interest. NMCD's policy allows inmates to receive correspondence and access to publications. Doc. 36-1 at 55, 72, 89, 107 (correspondence); *id.* at 56, 61, 78, 90, 95, 107, 113, 125, 131, 147 (publications). The access is not unlimited, however, if the correspondence or publication threatens the safety and security of the facility and other persons. *See id.* at 55, 72, 89, 107. To this end, inmate mail, both incoming and outgoing, is opened and inspected. *Id.* at 56, 58, 90, 92, 127, 144. Mail may be accepted or rejected "based on the legitimate institutional interests of order and security." *Id.* at 56, 58, 90, 107, 125. The enhancement of prison security and proper allocation of resources are legitimate government interests. *See Overton,* 539 U.S. at 133 (internal prison security is "perhaps the most legitimate of penological goals").

One of the ways NMCD maintains its institutional interests of order and security is to "avoid creating a sexualized atmosphere in the prisons." Doc. 36-4 at 3. NMCD avoids creating a sexualized atmosphere for a number of reasons. First, as defendants point out, "prisons are also workplaces for NMCD employees. Maintaining a safe and appropriate work environment for prison staff is a legitimate penological consideration." Doc. 36 at 29. Most workplaces prohibit the display or possession of sexualized images that would evidence a hostile work environment. *Rocha Vigil v. City of Las Cruces*, 119 F.3d 871, 875 (10th Cir. 1997) (sexually explicit pictures contributed to a hostile work environment); *Dunlap v. Spec Pro, Inc.*, 939 F. Supp. 2d 1075, 1084 (D. Colo. 2013) (same); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988) (pin-ups are evidence of a hostile work environment); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.

Supp. 1486, 1493–99 (M.D. Fla. 1991) (images of "women in various stages of undress and in sexually suggestive or submissive poses," 760 F. Supp. at 1494, and other pictures of nude or partially nude women were evidence of a hostile work environment). Prisoners displaying sexually explicit photographs could be evidence of a hostile work environment. Doc. 36-4 at 3. Defendants are correct that "[p]risons, like any other workplace, can prohibit display and possession of such publications/photographs to maintain a safe and appropriate work environment." Doc. 36 at 29. Second, some inmates are sex offenders. Doc. 36 at 29. A sexually-charged environment is detrimental to their treatment and rehabilitation. Doc. 36-4 at 3. Third, the Prison Rape Elimination Act (PREA) requires NMCD to maintain a policy of zero tolerance of sexual abuse and sexual harassment. *Id.*; 28 C.F.R. § 115.11(a). NMCD, therefore, seeks to avoid creating a sexualized atmosphere in the prisons.

NMCD has promulgated policies with regard to photographs and publications to keep photographic images of sexually explicit content out of the hands of inmates housed in NMCD facilities. Doc. 36-1 at 59, 60, 76–77, 93, 94, 111, 129, 145. Specifically, NMCD does not allow material that is "obscene" or that includes "photographic images of sexually explicit content . . . . This includes but is not limited to sexually explicit depictions of partially or total human nudity. Publications that regularly and consistently contain such content may be rejected on this basis." Doc. 36-1 at 59, 60, 76, 77 (publications may be rejected if they contain "photographs of female(s) partially or totally nude and/or posed in a sexually explicit position"), 93, 111, 129, 145. Photographs are rejected pursuant to the same standards and procedures as publications. Doc. 36-1 at 94, 112, 129, 146.

Restrictions on the ingress of sexually explicit materials into prison facilities are commonplace, and the Tenth Circuit has upheld such prohibitions. *Jones v. Salt Lake Cty.*, 503

F.3d 1147, 1155–56 (10th Cir. 2007) (upholding jail provision prohibiting publications containing any sort of sexually explicit material under a safety and security rationale); *Sperry v. Werholtz*, 413 F. App'x 31, 39–40 (10th Cir. 2011) (upholding Kansas Department of Corrections regulation prohibiting possession of sexually explicit materials by inmates, where the regulation was implemented to maintain security at the state's facilities, to aid in the rehabilitation of incarcerated sex offenders, and to stymie sexual harassment). In this district, the Honorable Kenneth Gonzales, United States District Judge, recently upheld, under the *Turner* standard, an obscenity regulation on which prison officials relied to deny an inmate a Sports Illustrated Swimsuit Edition magazine, which "contained images of individuals partially or totally nude and/or posed in sexually explicit positions." *Heard v. Bravo*, 13-cv-01236-KG-WPL, Doc. 110 at 5–7, (D.N.M. June 19, 2015) (internal quotation marks omitted). The policies at issue in this case are rationally related to the legitimate penological interests asserted by defendants.

Turning to the second *Turner* factor, even if Gonzales could establish a right to sexually explicit materials, there are no alternative means of exercising the right that remain open to prison inmates. While the policies at issue limit inmates' ability to receive certain discrete categories of materials, they leave inmates with broad access to an array of publications, and inmates remain free to correspond with others outside the facility. Doc. 36-1 at 55, 56, 61, 72, 78, 90, 95, 107, 113, 131, 147. Jerry Roark, the Director of the Adult Prisons Division, explains that "[p]rohibiting inmates from displaying/posting [sexually explicit] photographs from publications would not be an effective solution because of the administrative problems of monitoring the cells and of needing the inmates' cooperation in not displaying/posting the photographs." Doc. 36-4 at 3. Roark further explains that monitoring each inmate's cell to remove a posted photograph would add to the burden of already strained staff resources. *Id.* For

example, one correctional officer can monitor for posted material, but it would take additional correctional officers to enter the cell of any noncompliant inmate. *Id*. Also, attempting to monitor publications and remove pages with sexually explicit photographs would require additional mailroom staff, which is administratively infeasible, and could cause more discontent then prohibiting the publications outright. Doc. 36-4 at 3–4. Moreover, "[d]isciplining inmates for displaying photographs creates additional administrative burdens for prison administration." *Id.* at 3. Consequently, there are no easy alternative means for allowing inmates to view sexually explicit material.

With regard to the third and fourth *Turner* factors—"the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" and "the absence of ready alternatives is evidence of the reasonableness of a prison regulation," *Turner*, 482 U.S. at 90—defendants have pointed to the significant, serious potential consequences of permitting the prohibited materials to enter into the prison. The threat of sexual harassment and the other ills discussed above tip the third and fourth *Turner* factors in favor of defendants. An evaluation of all four *Turner* factors establishes the reasonableness of NMCD's prohibitions of sexually explicit photographs and publications inside its prison facilities.

2. Unedited Music

The Court would be well within its authority to dismiss Gonzales' claim that he is not permitted unedited music because he failed to exhaust any grievance regarding unedited music. *See, e.g.*, *Jones*, 549 U.S. at 216; *Porter*, 534 U.S. at 532. Gonzales does not dispute that he failed to exhaust this claim. Nevertheless, Gonzales' claim also fails on substantive grounds.

Musical expression is a form of constitutionally protected speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989). Prisoners, however, do not have the same breadth and scope of First Amendment rights as other citizens. *Turner,* 482 U.S. at 84–85. Applying the four-part test in *Turner*, NMCD's policies restricting inmate rights to unedited music are permissible.

Defendants do not direct the Court to a specific policy that regulates the music permitted by NMCD. Rather, defendants submit the affidavit of German Franco, Director of Adult Prisons for NMCD. Franco explains:

> Inmates . . . incarcerated at NMCD facilities are permitted to purchase personal electronic devices, such as MP3 players, and are also permitted to purchase music downloadable onto their personal devices. The purchases are made from funds deposited in the inmates' own accounts, through a service provider (Access Corrections, Inc.) that is contracted by NMCD to provide these services to the inmates.

> Some music contains violent or sexually explicit lyrics that are inappropriate for inmates. As part of the service that Access Corrections, Inc. provides to NMCD, it edits the music it makes available to inmates, to delete content that is inappropriate for inmates. The editing makes that music available to the inmates, minus the inappropriate content.

Doc. 36-3 at 2. Gonzales does not specify the alleged editing to which he objects (*i.e.*, whether he wished to obtain music with violent or sexually explicit lyrics, or whether there is some specific song he wishes to obtain in unedited format). For purposes of this order, therefore, the Court assumes that Gonzales objects to all editing of violent or sexually explicit lyrics in the music made available to inmates.

Again, "the regulation or practice in question must further an important or substantial governmental interests unrelated to the suppression of expression." *Thornburgh*, 490 U.S. at 415. Editing music to delete violent and sexually explicit lyrics is reasonably related to NMCD's legitimate penological interests for the same reasons NMCD's ban on sexually explicit photographs and publications is reasonably related to its penological interests—it protects

institutional security, discourages sexual harassment among guards and inmates, and does not impede the prison's efforts to rehabilitate its sex offender population. *See Herlein v. Higgins*, 172 F.3d 1089, 1091 (8th Cir. 1999) ("We do not believe that it is arbitrary or irrational to believe that music with violent or sexually explicit lyrics might present a security risk in an environment that includes gangs and sex offenders."). Correctional facilities frequently impose content-based restrictions: prohibitions on obscenity, sexually explicit materials, materials that instruct on the manufacture of contraband, and/or materials relating to escape plans to maintain security. *See, e.g., id.* at 404 (prohibitions on materials that "might facilitate criminal activity"); *Jones*, 503 F.3d at 1155 (prohibition on "technical publications" and "any sort of sexually explicit material"); *Ind v. Wright*, 52 F. App'x 434, 436 (10th Cir. 2002) (prohibition on reading materials that "encourage or endorse[] violence or disorder"). Prisons may also impose content-based restrictions on the music that inmates listen to. *See generally Herlein*, 172 F.3d 1089. NMCD does not prevent inmates from obtaining all music, but provides an appropriate alternative to completely eliminating music with violent or sexually explicit lyrics by offering inmates edited music. The practice of editing music was enacted to address specific safety and security concerns; it stands under *Turner* and is not unconstitutional.

Gonzales does not dispute any of the facts established by defendants. Instead, he attempts to explain why he believes that he and other inmates should have access to sexually explicit material and unedited music. *See* Doc. 41 at 2; Doc. 43 at 5; Doc. 44 at 2–3. Gonzales' personal beliefs cannot support a denial of a motion for summary judgement, and are disregarded in light of the undisputed material facts. *Argo*, 452 F.3d at 1200.

Gonzales further contends that there is no threat to security if he is allowed to have unedited music or sexually explicit photographs. Doc. 43 at 5. The Court, however, "must

accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132. Gonzales has not established a violation of his First Amendment right to freedom of expression.

### 3. Vagueness in Policy Time Limits

Gonzales alleges that "when it comes to (NMCD) [policy] standard of structure they are [too] vague and lack firmness, direct [formalities] when it comes to time limits." Doc. 1 at 2. Even liberally construing Gonzales' complaint, the Court cannot decipher what Gonzales is referencing. Gonzales does not identify the policy he is referring to, why it is vague, or which time limits are not firm. Vague and conclusory allegations that his federal constitutional rights have been violated do not entitle a pro se plaintiff to a day in court, regardless of how liberally the court construes such pleadings. *See Ketchum v. Cruz*, 775 F. Supp. 1399, 1403 (D. Colo. 1991), *aff'd*, 961 F.2d 916 (10th Cir. 1992). "The broad reading of the plaintiff's complaint does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Hall*, 935 F.2d at 1110. The Court is not to assume the role of advocate for a pro se prisoner, *id.*, and the Court will not formulate an argument for Gonzales based on the alleged vagueness in policy time limits.

### 4. Issues Raised in Response to the *Martinez* Report

In a letter preceding the *Martinez* report (Doc. 35), his several responses (Docs 39, 41, 43, 44, 45), and his motion to amend (Doc. 47), Gonzales asserts, in a conclusory fashion, other issues he has with NMCD:

> a. Gonzales contends that due to some unidentified policy, NMCD is keeping him away from his family by taking away his visitation. Doc. 35 at 2–3; Doc. 39 at 2, 4, 66, 67; Doc. 43 at 1; Doc. 47 at 2.

b.  Gonzales complains that he is not allowed to keep what he purchased at one facility when he is moved to another facility and complains about the prices and taxes on commissary items.  Doc. 35 at 3; Doc. 39 at 6, 8, 65, 66, 67; Doc. 43 at 3, 4.

c.  Gonzales asserts that he is being retaliated against and harassed by Warden Janecka, J. Beaird,[12] Sgt. Deleon, Ornelas, Sgt. Martinez and Major Sandoval. Doc. 39 at 4, 59–60, 67.

d.  Gonzales complains that urinalysis tests are conducted in retaliation and for harassment purposes.  Doc. 35 at 1–2; Doc. 39 at 7; Doc. 41 at 3–4; Doc. 43 at 3–4, 6–7; Doc. 44 at 3–4; Doc. 45 at 1; Doc. 47 at 1.

e.  Gonzales further asserts that the disciplinary officer is not following through with his informal complaints.  Doc. 41 at 3; Doc. 43 at 1; Doc. 45 at 1; Doc. 47 at 1.

f.  Gonzales complains that he is not allowed to correspond with or receive pictures of his incarcerated brother.  Doc. 39 at 7, 60, 67.

g.  Finally, Gonzales contends that he was moved from one facility to another without being taken to committee.  Doc. 47 at 1.

Gonzales has not exhausted any of these claims and did not allege any of them in his original complaint.  Gonzales does not specify when any of these additional complaints took place or how they have any possible connection to the matters contained in his original complaint.  To the extent Gonzales is attempting to amend or supplement his complaint, I recommend that any such attempt be denied.

Rule 15(a) of the Federal Rules of Civil Procedure, which governs the amendment of pleadings, provides in relevant part that "[a] party may amend its pleading once as a matter of course within . . . 21 days after serving it."  FED. R. CIV. P. 15(a)(1)(A).  Any additional amendments require the opposing party's written consent or the Court's leave.  *See* FED. R. CIV. P. 15(a)(1)(B).  Local Rule 15.1 requires a proposed amended complaint to accompany a motion

---

[12] The Court previously dismissed with prejudice other claims made by Gonzales against John Beaird.  Doc. 33.

to amend. *See* D.N.M.LR-Civ. 15.1 ("A proposed amendment to a pleading must accompany the motion to amend."). Gonzales has not received written consent from defendants or the Court's leave to amend his complaint.

Rule 15(d) governs the supplementation of pleadings and it provides as follows:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

FED. R. CIV. P. 15(d). "Rule 15(d) gives trial courts broad discretion to permit a party to serve a supplemental pleading setting forth post-complaint transactions, occurrences or events." *Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1278 (10th Cir. 2001). Rule 15(d) motions "are addressed to the sound discretion of the trial court," but such motions "should be liberally granted unless good reason exists for denying leave, such as prejudice to the defendants." *Id.*

Gonzales' attempt to amend or supplement his complaint is untimely and unduly prejudicial to defendants. Gonzales' additional complaints are based on separate facts and circumstances than those in the original complaint and do not have any relationship to the facts in the original complaint. Further, defendants already have completed a *Martinez* report. The attempted amendment comes more than six months after the *Martinez* report was filed. Any amendment at this point would unfairly prejudice defendants by forcing them to reinvestigate the additional matters and supplement the *Martinez* report.[13]

Because Gonzales' additional allegations arise from new facts and allegations against new parties, including Lt. K. Rivera, *see* Doc. 41 at 3, Warden Janecka, J. Beaird, Sgt. Deleon,

---

[13] Defendants submitted a response to Gonzales' letter. Doc. 48. I do not reach the merits of the allegations contained in the letter because I recommend that the Court refuse to permit Gonzales to amend or supplement his complaint as explained herein.

Ornelas, Sgt. Martinez and Major Sandoval, Doc. 39 at 4, allowing Gonzales to initiate what is essentially a new lawsuit at this point in the proceedings also would run afoul of the screening process in 28 U.S.C. § 1915. In 1996, Congress significantly amended § 1915, which establishes the criteria for allowing an action to proceed *in forma pauperis* (IFP), *i.e.,* without prepayment of costs. Section 1915(e), as amended, requires federal courts to review complaints filed by persons who are proceeding IFP and to dismiss, at any time, any action that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B). "Under §§ 1915(e)(2)(B)(i) and (ii), a court <u>must</u> screen a complaint filed IFP and dismiss the case at any time if the court determines that the action or appeal is frivolous or malicious or fails to state a claim on which relief may be granted." *Creamer v. Kelly*, 599 F. App'x 336, 337 (10th Cir. 2015) (unpublished) (internal quotation and citation omitted) (emphasis added). In addition, 28 U.S.C. § 1915A, entitled "Screening," requires the court to review complaints filed by prisoners seeking redress from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). If the complaint is "frivolous, malicious, or fails to state a claim upon which relief can be granted," or "seeks monetary relief from a defendant who is immune from such relief," the court must dismiss the complaint. 28 U.S.C. § 1915A(b).

Further, the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997e, requires the court "on its own motion or on the motion of a party" to dismiss any action brought by a prisoner with respect to prison conditions under 42 U.S.C. § 1983 if the action is "frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." *See* 42 U.S.C. § 1997e(c)(1), *unconst'l on other grounds*, *Siggers-El v. Barlow*, 433 F. Supp. 2d 811, 813 (E.D. Mich. 2006) (unconstitutional to the extent

that it precludes mental or emotional damages as a result of defendant's violation of plaintiff's First Amendment rights). Gonzales is considered a "prisoner" as that term is defined under the Prisoner Litigation Reform Act, *see* 28 U.S.C. §§ 1915(h), 1915A(c), and he has been granted leave to proceed IFP in this action, Doc. 6. The individuals named in the additional allegations are presumably employees of a governmental entity. Additionally, Gonzales is complaining about the conditions of his confinement. Thus, any attempted amendment must be reviewed under the authority set forth above.

If the Court were to simply allow Gonzales to amend or supplement his complaint with entirely new parties and allegations, it would bypass the screening process required under 28 U.S.C. § 1915. The newly named parties would be responsible for answering the amended complaint without the benefit of the Court first determining whether Gonzales' claims are frivolous, malicious, fail to state a claim, or seek monetary relief from a defendant who is immune from such relief. Thus, the Court should deny Gonzales' attempts to amend or supplement his complaint.

## III.    Recommendation

There is no dispute of material fact and the defendants are entitled to judgment as a matter of law. NMCD's policies are reasonably related to legitimate penological interests. Accordingly, I recommend that the Court GRANT defendants' motion for summary judgment (Doc. 36), DENY Gonzales' motion to amend or supplement (Doc. 47), DENY the injunctive and declaratory relief sought by Gonzales, and DISMISS Gonzales' complaint with prejudice.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

Laura Fashing
United States Magistrate Judge